| Date Filed | # | Docket Text |
|---|---|---|
| 02/01/2018 | 570 | Minute Entry for proceedings held before Judge Mark R. Hornak: Motion Hearing as to FREDERICK H. BANKS held on 1/31/18. (Court Reporter: Richard T. Ford) (bdb) (Entered: 02/01/2018) |
| 02/01/2018 | 571 | NOTICE *TO THE COURT RELATING TO BANKS' ACTIVITY WHILE IN CUSTODY* by USA as to FREDERICK H. BANKS (Attachments: # 1 Exhibit)(Cessar, Robert) (Entered: 02/01/2018) |
| 02/02/2018 | 572 | NOTICE by the Court. Notice is hereby provided by the Court to the parties that the Court has this date referred the civil actions filed by the Defendant against the Court, the Chief Court Reporter and the Court's former law clerks in the Court of Common Pleas of Mahoning County, Ohio to the Administrative Office of the United States Courts, requesting that that office refer the matter as appropriate to the Department of Justice for removal to the United States District Court for the Northern District of Ohio. The Court further confirms the notice it placed on the record that the Court has referred the involuntary bankruptcy petitions filed by the Defendant in the U.S. Bankruptcy Court for this District and against this Court's former law clerks to the United States Marshal for this judicial district for such further investigation as may be appropriate, it appearing to the Court that such filings by the Defendant may be in violation of 18 U.S.C. 1521. Text-only entry; no PDF document shall issue. This text-only entry constitutes the Court's order or notice on the matter. (Hornak, Mark) Modified on 2/5/2018 to add text-only info. (ksa) (Entered: 02/02/2018) |
| 02/02/2018 | 573 | MEMORANDUM ORDER as to FREDERICK H. BANKS. For the reasons as set forth herein, it is hereby ORDERED as follows: Attorney Roe's 508 Renewed Motion to Withdraw as Attorney is granted, effective upon the entry of the appearance of substitute counsel for the Defendant. The Defendant's Motion at ECF No. 565 is DENIED WITHOUT PREJUDICE AS MOOT. The Clerk will transmit a copy of this Order to the First Assistant Public Defender for this District with the request of this Court that substitute counsel for the Defendant be appointed forthwith. Mr. Roe shall give notice of this Order to the Court of Appeals forthwith. The disposition of all other pending Motions is held in abeyance pending further Order of this Court, to be entered after new counsel appears for the Defendant and has an opportunity to weigh in on such matters. Signed by Judge Mark R. Hornak on 2/2/18. (bdb) (Entered: 02/02/2018) |

'Perplexing' Cuba noise 'attacks' continue to baffle State Department

By Laura Koran and Patrick Oppmann, CNN

Updated 7:22 PM ET, Tue January 9, 2018
State Department pulls employees out of Cuba
Now Playing State Department pulls...
Source: CNN

State Department pulls employees out of Cuba 02:34

At least 24 diplomats and family members were affected, some with damage that they may carry for years, officials testified
All the affected US personnel have experienced some improvement over recent months

(CNN)More than a year after US diplomats in Havana, Cuba, began reporting to embassy officials that they were hearing bizarre noises and experiencing a range of physical symptoms, the State Department and federal investigators have been unable to attribute the source or cause of the ailments, which they've determined, simply, "were most likely related to trauma from a non-natural source."
At least 24 diplomats and family members were affected, some with damage that they may carry for years, officials testified at a Senate Foreign Relations subcommittee hearing Tuesday.

While the incidents remain a mystery, State Department officials who testified said they believe Cuba has clearer information about who is behind what they classified as "attacks" on US diplomats working on the communist-run island.

At a news conference Tuesday night in Havana, Josefina Vidal, the director general of US affairs at the Cuban Foreign Ministry, blasted the hearing.

"There is no type of evidence," Vidal said. "There is not even evidence of what occurred, when it occurred, why it occurred, who or what was the motive. We don't even have information or evidence that the health problems originated in Cuba."
During the hearing, US officials detailed how personnel came to experience a variety of symptoms including sharp ear pain, headaches, ringing in one ear, vertigo, disorientation, attention issues and signs consistent with mild traumatic brain injury or concussion. In nearly all cases -- 24 in total -- the ailments were preceded by some sort of "acoustic element," such as a "high-pitched beam of sound" or a "baffling sensation akin to driving with the windows partially open in a car."
Todd Brown, the State Department's diplomatic security assistant director for international programs, admitted the US cannot guarantee the safety of its remaining diplomats in Havana -- reduced in number since the threat emerged -- because it still doesn't understand the nature of the incidents, and is providing guidance to staff based on what affected personnel have experienced so far.

Dr. Charles Rosenfarb, a medical director for the agency, said staff have been advised to move away from any strange sounds they hear, since the duration of exposure appears correlated to the severity of symptoms.
That advice seemed to frustrate the ranking Democrat on the subcommittee, Sen. Bob Menendez of New Jersey, who compared the directive to the hide-under-your-desk air raid drills that were supposed to protect school kids in the event of a nuclear attack in the Cold War.

"Ridiculous," he said.

All the affected US personnel have experienced some improvement over recent months,

said Rosenfarb, with 10 returning to work either full time or part time.
Cuban Minister rejects US sonic attack claims

The subcommittee's chairman, Sen. Marco Rubio, a Florida Republican, faulted the State Department for its failure to form an Accountability Review Board to review the incident and for what he called its slow response to cases reported in late 2016 and early 2017.

In his testimony, Francisco Palmieri, the acting assistant secretary of state for Western Hemisphere affairs, assured the senator that Secretary of State Rex Tillerson has now decided to form an ARB, which will convene after Congress has been formally notified.

The Accountability Review Board is an internal State Department mechanism to review security incidents involving diplomatic personnel. The most well-known recent review board followed the deadly attack on a diplomatic compound in Benghazi, Libya, in 2012.

Echoing Rubio's criticisms, Menendez cited a "bureaucratic, inadequate and troubling" response at the State Department and US Embassy over the past year.

"The failure of leadership at the department and at post, the sluggish reaction to the initial reports of afflicted personnel, the aloof response of the medical team at the State Department, silence from diplomatic security to the rest of the department is simply staggering," said Menendez.

Both Rubio and Menendez cast doubt on the Cuban government's claims of ignorance when it comes to the cause of the incidents, as well as their more recent efforts to discredit the accounts of affected diplomats.

The idea that such an attack would go unnoticed by Cuban security officials in heavily surveilled Havana, said Rubio, was "outside the realm of reasonable -- it's ridiculous."

Menendez, for his part, said it was "unfathomable" that Cuban elements were not either involved or at least aware of more than they were admitting to.
That skepticism is shared by the State Department. At a briefing Tuesday afternoon, the agency's undersecretary for public diplomacy, Steve Goldstein, said bluntly, "We believe that the Cuban government has the answer to this, and that they should be doing more to assist us in bringing this to resolution."

Goldstein also told reporters the State Department is not currently considering returning to full staffing levels at the embassy.

The Cuban government has called the alleged attacks "science fiction" and complained that Washington has not shared much in the way of medical details or let their investigators inspect the diplomatic residences where many of the incidents took place.

Tillerson told reporters at a news conference last month that the US is "convinced these were targeted attacks."

While the secretary has not accused the Cuban government of being behind the incidents, he said he holds the government responsible for allowing them to continue.

"What we've said to the Cubans is [it's] a small island, you got a sophisticated security apparatus, you probably know who's doing it, you can stop it," Tillerson said in December. "It's as simple as that."

But the inability of the US government to pinpoint the direct cause of the incidents has unsettled US lawmakers, investigators and diplomatic officials.
In his opening remarks, Brown, the State Department security official, acknowledged that, "unfortunately, this remains a perplexing case."
Rosenfarb, for his part, admitted that, "managing this evolving situation is challenging."

"Mission personnel describe a multitude of symptoms, many of which are not easily quantifiable and not easily attributable to a specific cause," he said.
The officials would not comment on a recent Associated Press report that suggested that FBI investigators "uncovered no evidence that sound waves could have damaged the Americans' health."

However, Brown suggested that an acoustic cause was still a possibility.
"I don't know that I would rule it out entirely," he said. "The acoustic element could be used as a masking piece."

"I'm not claiming that it's acoustic," he clarified. "I just know there's been an acoustic element associated with the sensations and the feelings."
Over the weekend, Republican Sen. Jeff Flake of Arizona -- who was spotted at the hearing but did not directly question the officials -- told CNN, "The Cubans bristle at the word 'attack.' I think they are justified at doing so. The FBI has said there is no evidence of an attack. We shouldn't be using that word."

Several Canadian diplomats were also affected.

The Enduring Mystery of the Cuba Sonic Attacks

No one knows who's behind them. But some U.S. embassy staff is leaving.

Alexandre Meneghini / Reuters

The U.S. State Department announced Friday it was withdrawing more than half its embassy staff from Cuba following "specific attacks" that sickened at least 21 U.S. embassy employees. On some level it was only the latest blow to Barack Obama's historic rapprochement with Cuba; on another, though, it was a diplomatic break that never happened. Just last week, Rex Tillerson, the U.S. secretary of state, said Washington was reviewing a plan to close the entire embassy. As it is, U.S.-Cuba relations remain largely intact.

That the response wasn't more severe is partly a reflection of the mystery at the core of the attacks: No one yet knows who is responsible. Cuban government officials have denied responsibility, and appeared mystified at the cases. Canadian diplomats also were affected. And Cuba is cooperating in the investigation.

It's somewhat routine for the State Department to withdraw non-emergency staff from its embassies when there are specific security concerns (see here, here, here, and here). In the Cuban context, however, Friday's announcement represented a blow to a slow thaw in U.S.-Cuban relations, kicked off only a year ago by a visit from Obama. That trip was capped with a signature initiative of his foreign policy: the normalization of U.S. relations with Cuba after more five decades. This is an initiative that his successor has begun to reverse, with President Donald Trump announcing in June limitations on tourism and trade to the island. That move fell short of the Trump administration's announcement that he was "canceling the last administration's completely one-sided deal with Cuba," but it did eliminate the so-called "people-to-people" exchanges, which allowed Americans to travel to Cuba without seeking government approval or scheduling the trip through a licensed tour company.

So perhaps the real surprise is that Trump's administration didn't go further on Friday. U.S. diplomats first complained of unexplained hearing loss in the fall of 2016, but it wasn't until last month that Tillerson said that U.S. officials had suffered "health attacks," adding that Washington held "Cuban authorities responsible for finding out who" was behind them. The State Department had previously called what happened to the officials "incidents," but on Friday officials used more severe language to say the embassy staff was "targeted in specific attacks."

A U.S. State Department official, speaking Friday on condition of anonymity, said at least 21 U.S. government officials in Havana had exhibited a range of physical symptoms, including hearing loss, dizziness, tinnitus, balance problems, visual problems, headache, fatigue, cognitive issues, and difficulty sleeping. The official said investigators had been unable to determine who or what was causing these attacks—though news reports have said the U.S. doesn't think Cuba is responsible. A second State Department official said there was "no definitive answer on the source or cause of the attacks." CNN previously reported that the "device used in the attacks appeared to be a type of sonic weapon that emitted sound waves capable of inflicting physical harm."

Under the steps announced Friday, the State Department said it was also suspending routine visa operations indefinitely; limiting short-term U.S. government travel to Cuba to those involved in the investigation or to those who have a need to travel to the country; and issuing a travel warning to Americans not to travel to Cuba.

The official also said the U.S. will, for the time being, stop sending delegations to Cuba for meetings. Friday's order also covers the families of the non-emergency personnel.

"The decision to reduce our diplomatic presence in Havana was made to ensure the safety of our personnel," the first official said. "We maintain diplomatic relations with Cuba and our work in Cuba continues to be guided by the national-security and foreign-policy interest of the United States."

Speaking in New York this month, Tillerson said he was evaluating whether to close the embassy down altogether. CNN reported U.S. officials were frustrated by Cuba's lack of progress in the investigation—though FBI officials were in the country working with Cuba's Interior Ministry to determine how the attacks occurred. Tillerson raised the issue with his Cuban counterpart in Washington, and Cuba urged the U.S. not to take "hasty" decisions over the issue. The second State Department official said Friday the announcement to withdraw more than half of the embassy's staff came after "careful analysis."

"What was considered prudent was to considerably reduce the number of people present, thereby reducing the exposure of individuals who could be exposed to these attacks," the official said. "This was seen as a major step toward addressing some of our vulnerabilities and reducing our exposure."

Ambassador Barbara Stephenson, the president of the American Foreign Service Association, the union that represents U.S. foreign-service officers, told me after Friday's announcement that "American diplomats need to remain on the field and in the game.

"We've got a mission to do. We operate all over the world, in places with serious health risks," such as parasites, Zika virus, dengue, air pollution," she said. "This is our reality. We work in difficult environments. The answer can't be we just pull the flag down and move American presence from the field. We have a mission to do and we really think being present matters."

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.    ) | Criminal No. 2:15-cr-00168 |
| ) | |
| FREDERICK H. BANKS  ) | Judge Mark R. Hornak |
| ) | |
| Defendant.  ) | |

## MEMORANDUM ORDER

The Defendant's appointed counsel, Adrian Roe, has moved to withdraw from further representation, ECF No. 508, based principally on the fact that the Defendant has sued him in state court in Ohio for legal malpractice, and that case is proceeding to the degree that Mr. Roe has been required to retain counsel to address such matters on the merits. Mr. Roe has also advised the Court that there is a persistent and profound breakdown of effective communications between him and the Defendant regarding the merits of the Defendant's defense in this case, and as exemplified by the Defendant's pro se filing at ECF No. 569. In that filing, the Defendant persists in his insistence that the issue of C.I.A. mind control be injected into this case, and reciting what the Defendant believes to be a fundamental connection between C.I.A. activity, the Pulse nightclub massacre in Orlando, Florida, the fatal alligator attack on a young child at Disney World, the Las Vegas/Mandalay Bay mass shooting, and the actions of a mother and father in Southern California in imprisoning their own children in a horrific manner.

At a hearing held on Mr. Roe's motion in this Court on January 31, 2018, the Defendant further stated that he believed that these connections were further exemplified by the then-anticipated release of what had been described as the "Nunes Memo" by the Chairman of the U.S. House Committee on Intelligence which would demonstrate a connection between FBI corruption,

the FISA Court, and the Defendant. Mr. Roe identified that filing by the Defendant as being a prime example of the fundamental disconnect between him and the Defendant as to legal strategy.

The United States does not oppose the grant of this Motion, advising the Court on the record that, at the present time, the Defendant is under an active, open criminal investigation based on certain involuntary bankruptcy petition filings the Defendant has made, including as against Mr. Roe, as to which the United States reasonably believes that Mr. Roe will likely be a material witness. The Defendant has also asked this Court to remove Mr. Roe, ECF No. 565, a position that he reaffirmed on the record in open court at the hearing held on January 31, 2018, based on the Defendant's belief that Mr. Roe would improperly interpose an insanity defense on the Defendant's behalf, and would otherwise not advance the defenses central to the Defendant's view of this case, and of the world, related to CIA activity, the FISA Court and FBI corruption in the prior, now final, federal criminal prosecutions of the Defendant.

The Court is loath to grant the motion to remove Mr. Roe, but concludes that it nonetheless will do so. Here is why.

From the Court's perspective, Mr. Roe has done an admirable job in navigating the shoals of his duties of zealousness on behalf of the Defendant and his duties of candor to the Court and fealty to the law. He is intimately familiar with this case and the Defendant. The docket reflects 572 docket entries, overwhelmingly most of which are by the Defendant himself, or otherwise address his filings. The Defendant was indicted and first detained in late 2015, although as the Court has repeatedly advised the Defendant both on the record in open Court and in its Orders, the passage of time and the time to advance this case has been materially (if not entirely) been the direct result of the actions of the Defendant himself. The Defendant's litigation activity, and his facially retaliatory legal filings against Mr. Roe, and among others this Court's former law clerks,

would appear to be an indication that it is highly likely that the Defendant will persist in his conduct no matter who his lawyer is. *See United States v. John Doe #1*, 272 F. 3d 116 (2d Cir. 2001). It would not be surprising to the Court that it will be quite difficult to find a CJA panel attorney in this District who would be in a position to take on this defense, particularly if there is a material risk that the Defendant will make such counsel the next target of his technological and litigation attacks. The Federal Public Defender for this District advises that that office has a conflict that will prevent it from taking on this defense, making it highly likely that it will need to reach out to the Federal Public Defender in an adjoining District to undertake that responsibility. All of that will complicate the case, and postpone its ultimate resolution.

But, this Court is also quite aware that our Court of Appeals has entered an Order relieving Mr. Roe of any further representation, which this Court believes must carry special and particular weight as to these matters. Both Mr. Roe and the Defendant believe that this representation must end, and cannot continue. The United States advances a factual basis to support the conclusion that an actual, adversarial conflict between Mr. Roe and the Defendant is fast approaching. From the Court's perspective, Mr. Roe has been diligent in his duties under the most trying of conditions of representation, and by every appearance, the Defendant is engaged in a campaign as against Mr. Roe that is unlikely to dissipate. All of this taken together, notwithstanding that the substitution of counsel will complicate, rather than advance, the disposition of these proceedings, compels the Court to conclude that the representational relationship has reached a point from which it cannot continue, no matter the good faith of Mr. Roe, or the continuity of representation that he would bring to the Defendant's case.

Considering the record as a whole, the basis for the request for withdrawal, the position of the United States, the request of the Defendant himself that Mr. Roe be dismissed as counsel, and

3

the action of our Court of Appeals in doing so as to appellate matters on the Defendant's behalf, the Court is constrained to conclude that the ends of justice are best served by granting the Motion to Withdraw at ECF No. 508, and Adrian Roe is hereby relieved of his representation of the Defendant in this action. This Order is effective in such regards upon the entry of the appearance of substitute counsel for the Defendant.

The Defendant's Motion at ECF No. 565 is denied without prejudice as moot. The Clerk will transmit a copy of this Order to the First Assistant Public Defender for this District with the request of this Court that substitute counsel for the Defendant be appointed forthwith. Mr. Roe shall give notice of this Order to the Court of Appeals forthwith. The disposition of all other pending Motions is held in abeyance pending further Order of this Court, to be entered after new counsel appears for the Defendant and has an opportunity to weigh in on such matters.

The time for the filing of pretrial motions in this case is extended to and including the date sixty (60) days after the date of the last entry of the mandate (or final order in the absence of a mandate) of the Court of Appeals in any appeal or request for extraordinary relief now pending on behalf of the Defendant. It is therefore further ORDERED that the extension of time caused by this continuance from the date of this Order until the date falling sixty (60) days after the date of the last entry of the mandate (or final order in the absence of a mandate) of the Court of Appeals as to any appeal or request for extraordinary relief now pending on behalf of the Defendant be deemed excludable delay under the Speedy Trial Act 18 U.S.C. § 3161 et seq. Specifically, the Court finds that the ends of justice served by the granting of such extension outweigh the best interests of the public and the defendant to a speedy trial, 18 U.S.C. § 3161 (a)(7)(A). Failure to grant such extension would deny counsel for the defendant the reasonable time necessary for

effective preparation, taking into account the exercise of due diligence, and the time for the preparation of pretrial motions shall be so excluded.

_____
Mark R. Hornak
United States District Judge

Dated: February 2, 2018

cc: All counsel of record